The next case today is Emily Forsythe v. Wayfair, LLC, appeal number 21-1095. Attorney Goodman, please introduce yourself for the record and proceed with your argument. Thank you. Robert Goodman for Emily Forsythe, your honors. I would like to reserve three minutes of time for rebuttal. You may. There are two basic problems with the procedural issue and the other is a set of substantive issues. The first fundamental procedural issue is that the district court substituted itself for a jury in making findings of fact on multiple highly disputed material issues of fact. It did so most clearly in disregarding substantial evidence that Ms. Forsythe did not resign but was outright fired when she was no longer employed. This dictates reversal on the discriminatory and retaliatory termination claims. The district court also improperly found facts which were highly disputed when it ignored statements by Mr. McKnight reflecting sex bias including that he wanted to replace her with one of three specific men and that's just exactly what happened. The district court finally improperly found facts and ignoring the testimony of Wayfair's top human resource witness Candace Smith that Ms. Forsythe's complaints of sexual harassment and discrimination were not taken seriously. This was an irrigation of the jury's proper role on multiple issues. This court has repeatedly emphasized including two of your honors that rule 56 insists that facts summary judgment be taken in the light most favorable to the non-movement and exclude consideration of reported contrary facts. Judge Selya has decided Calero-Cerezo. Judge Kayada has decided the Melo case, the Jones versus Boston case, and the Lincare case, all of which go to the proper treatment of disputed facts by a district court. They do not permit what happened here. On the substantive law issues, there was a failure by the court to apply applicable law to the issue of severe or pervasive sexual harassment and that's in the disjunctive, of course, nor there was also a failure to apply the law to the issue of pretext on the two termination claims because when you say that somebody resigned, that's not a legitimate reason for their termination. There is no pretext that arises. Mr. Goodman, on your first claim there, that was an alternative holding that it was not severe and pervasive. As I understood it, the principal holding was that the perpetrator was not a supervisor so therefore there's not vicarious liability for the employer and the employer conducted an investigation and concluded with a conflicting testimony by your client and the alleged abuser didn't find support. So why doesn't that, why isn't that, what was there about the investigation that would require us to then nevertheless hold the employer liable? Because Candace Smith, four minutes remaining, four minutes, because Candace Smith, the top human resource witness who testified said that Mr. Trevor Schaffer-Figueroa, the HR representative who purported to ask the right questions, including the fundamental question of whether a reasonable woman would have been offended by the six months of physical and verbal harassment and also that he relied solely on the alleged physical harassers' denial of the physical harassment to reject her position that she was physically harassed as well as verbally harassed. Verbal harassment would have been enough but Ms. Candace Smith's criticisms of her own immediate subordinates' handling of the investigation were stiff and brutal and they were ignored by the district court. This overlaps, of course, with a procedural issue. Let me pause you. So you're pointing to the Candace Smith testimony. Was any of that covered? There were a large number of statements of objection, too. Let me just assume for a second, and I know you disagree, assume for a second that we think the court had the authority to do that under Local Rule 56. Does that at all bear on your point that the Candace Smith testimony provided a factual basis for concluding that the investigation was not up to snuff? It does not. They didn't touch Candace Smith's testimony with a 10-foot pole. Okay. And the district court, we complied with the stated rule of the district court in addressing the respondent's or the defendant's statement of facts and precisely contravened certain facts and then other facts, which they didn't even, again, touch with a 10-foot pole, other factual matters. We offered substantial testimony in her favor. And on the resignation, Your Honor, she continued to work. There were conflicting communications to her own superiors about whether she resigned, when she resigned. She was told not to go on a business trip the morning after the evening on which she told she was resigned and obviously did not agree with that. She was told not to go on a business trip. You're no longer our employee. That's an outright termination. There is testimony that the resignation argument was purely hindsight argument. Well after Thursday it purportedly was communicated, Mr. Trevor Schaffer-Figueroa himself conceded that he didn't necessarily expect her to agree that she had absolute stunning issue of fact on resignation and there was evidence, which they did not controvert, of actual outright termination that Tuesday morning when she was told not to go on the business trip. And then what do you say? They say that the conversation she had with her fellow employee in which she solicited a buyout severance agreement, they say that that within the industry was fairly construed as a resignation. What's your response to that? First of all, your honor, there's no authority that they offer for that. Second of all, it takes two to tango. She said, you want to offer something, necessarily I'll consider it. Well, that isn't the end of the story. And she was expressing frustration that her two separate complaints of sexual harassment and then discrimination by McKnight have been completely dismissed as deemed unsubstantiated. It is not a resignation for an employee to go, what do I have to do to make this, to remain an employee here and not be subjected to this conduct? Thank you. You've reserved some time for rebuttal. Thank you. At this time, Mr. Goodman, please mute your audio and video. And Attorney Kappelman, please introduce yourself on the record to begin. Thank you, Mr. Toomey. May it please the court, Lynn Kappelman on behalf of Wayfair LLC, appellee respondent. Ms. Kappelman, would you start by giving us your view about Candace Smith's testimony? I'm delighted you asked that, your honor. That was my intent and I respectfully refer the court to page 15 of our brief footnote eight, where we say quite clearly that appellant has flagrantly misrepresented the record regarding Ms. Smith's testimony about Schaffer-Figaro's investigation. We also refer to sites to the record, the Smith transcript, pages 1950, 58 and 51. In fact, you will find when you review the record quite clearly that plaintiff has flagrantly misrepresented. And in fact, it will be patently clear that Smith testified that Schaffer-Figaro conducted the investigation and reached the conclusion that the allegations were unsubstantiated, that she, quote, trusted him to do so and that she did not recall the details of his investigation. And you will also find, your honors, that Judge Stearns in the court below had reason to find that Mr. Schaffer-Figaro's investigation was not only sufficient but thorough because Mr. Schaffer-Figaro testified in the record that he spoke to Ms. Forsythe, he spoke to Mr. McDole, he spoke to colleagues who had witnessed their interactions, and he also reviewed all of the emails that she asked him to review, which reflected what she claimed was the verbal harassment. And you too can review yourself as to whether they constitute any sort of harassment. Am I right that she contends the record shows that she was never asked whether she had told anyone outside of Wayfair about what had happened? Is that right? She was never asked whether she had told. She absolutely testified, because I took her deposition and it is in the record, that she didn't tell anyone outside of Wayfair about any harassment until August 14th. Certainly no one in Wayfair knew about any harassment. My question was, I thought that the record showed, according to her, that in the investigation she was never asked whether she had told people outside of Wayfair. Is that right? Your honor, I think that's a bit of a red herring, because in the law that we have here in this jurisdiction... First, I just want to get the factual point right, though. Is that right? The record supports that? Whether she had told a friend that Shaffer Figueroa didn't ask her whether she had told a friend. I don't know whether Shaffer Figueroa ever asked her if she told anyone outside of Wayfair, and I don't believe he asked her, because that wasn't anything that was relevant to his inquiry. And then the second thing, it's not relevant to the inquiry? No, because you see, Judge Stearns was correct when he said that when it is a subordinate who is doing the harassing, or a co-worker, the correct question is whether there was a prompt and thorough investigation. And what you will find is that she testified that she was her manager. Wouldn't the investigation... would be to ask her if she has anybody that could corroborate it for her? Did she tell anybody that it had happened? And then you'd want to talk to those people, maybe, and find out. That would seem a normal course for an investigation to proceed. Here's the thing, though, Your Honor. What we're missing is Shaffer Figueroa didn't conclude that her subordinate's knee touched her in January of 2019 or March of 2019. What I think Judge Stearns and Shaffer Figueroa concluded was that whether his knee had touched her in January 2019 during a meeting and in March of 2019 during a meeting, one, it didn't create the kind of abusive and hostile environment that a reasonable person would have found intolerable and wouldn't have been able to continue working, especially when that person was the manager of the person who allegedly had their knee touching them. And two, it didn't create a severe and pervasive environment. So I think Shaffer Figueroa, if he did not ask whether she told a girlfriend about it in January or in March, was well within the determination not to do so. What he did look at was whether she had ever reprimanded him as her subordinate for having his knee touch her, whether she had ever told him that it was unwelcome when it happened, both of which she was quite clear about all along. She never reprimanded her subordinate for having his knee touch her. She never told anyone at Wayfair, either HR or anyone else. She also asked him to spend time with her socially after this event allegedly happened and complimented him. It was only when Mr. McDole himself asked to be removed from her supervision in April, she wanted him to stay. There's ample evidence that she wanted him to stay her subordinate, and he was the one that said, I don't want to work for you anymore in April and moved clear across the country to get as far away as he could. So whether or not Mr. Shaffer actually asked her if she had told a girlfriend that her subordinate's knee touched her during a meeting, I don't think was what he was looking at. What he was looking at was, did she behave appropriately if that happened by either reprimanding him, complaining to HR, or taking some other remedial action? Would that have created the kind of hostile environment that would be severe and pervasive? Those are, I think, the things that Judge Stearns recognized when he looked at this, and I do think that although he put the severe and pervasive argument first in his opinion, Judge Stearns, and I agree with it wholeheartedly, I think the easier decision for your honors is whether, under the circumstances where the alleged harasser was a subordinate and not a manager, and there is no vicarious liability, whether in fact... I think you're repeating yourself here. My point is just that your decision, your honor, is easier when you don't focus on the severe and pervasive nature of Judge Stearns' decision, but easier when you look at the vicarious liability standard that he was his... What about the issue of resignation versus termination? As I understand it, the conversation in which your client claimed she resigned was recorded, and we have a transcript that we've been able to read. I couldn't find it. She illegally recorded her conversation and then presented it during this case as evidence. Okay. Well, are you saying it's not competent evidence? I'm not. I'm saying that it's not as though we recorded it. So let's focus on what it says, all right? Yes. What language in that should we read as a resignation? I think that you should read it as a with a compelling severance package in the context. But your honor, it is important to... Let me ask you my next... This is actually a two-way oral argument in our court. It's two ways. Yes, your honor. So do you have any other basis for saying that she resigned as opposed to she was terminated? Yes. Thank you, your honor. If I may respond? Yes. Thank you, your honor. The context is quite clear. When she asked for a severance package, this was in the context of her saying to her manager, Mr. Whitty, I will not work with my new manager, Mr. McKnight, ever. I don't like him. I won't work with him. We knew that. Mr. Schiaffarella knew that when she said, give me a compelling package. He also knew that there were a number of peers and co-workers that were complaining about her on a regular basis, that she was impossible to work with and difficult. And he also knew that as soon as the investigation completed, her managers were going to have to talk to her about her communication. And she indicated to Mr. Whitty, in no uncertain terms, she was looking for jobs from four different new employers. So that's the context, your honor. So if... Let me ask you this question. If notwithstanding what you just said, we were to find that a jury could conclude that she was fired, that she didn't resign. If a jury could conclude that, is there still any basis for affirming summary judgment? Yes, your honor. Because without any evidence of a discriminatory motivation or animus, there can be no discriminatory termination. So termination in and of itself is not illegal. I think it's quite clear here that she resigned in the context, but even if she was terminated, and I'd like to address the timing that my colleague Mr. Goodman talked about with respect to the telling her not to go on a business trip. But let me answer your question first, your honor, and that is this. Termination without more is not illegal and does not give rise to a claim. There has to be some showing of discrimination. And the most important point you can keep in mind on this issue is that the person that made the decision, or the people that made the decision, to accept her resignation were Mr. Shaffer-Figueroa, Candace Smith, and legal. Mr. McKnight and Mr. Witte had zero role in accepting her resignation. Am I wrong that she was bringing a retaliation claim? She did bring a retaliation claim. Why isn't the timing of the firing, if the evidence would permit a jury to find that there was a firing following a report of the harassment, be the protected activity that would allow a jury to infer that the reason for the firing, particularly when their explanation for the firing, if it didn't hold up, as being a resignation, no firing at all, wouldn't that then say, well, they offered a reason, but the reason didn't hold up. So that's the showing of pretext that followed on the heels of a protected activity. Therefore, the jury could find retaliation. The issue with that, your the person she claims who retaliated against her, if you look very closely at her complaint, the person she claims retaliated against her was Corey McKnight. What she claims is, is that Corey McKnight and Mr. Witte were the ones that had the retaliatory discriminatory animus against her. And what you will find, if you look closely at the record, is that Mr. McKnight and Mr. Witte had no knowledge of the resignation and did not make the decision to accept the resignation and turn it into a termination, if you will. If that's the argument, there are separate decision makers. And what you will find, if you review the record clearly, is that Mr. Witte and Mr. McKnight said they didn't even know she had resigned or been terminated until after a severance agreement had been presented to her and she had left. And if I could have one minute just to address the timing issue, because I think that my brother misrepresented the timing, when she was told not to go on a business trip, it was after she had already been presented with the severance agreement on Monday. So she asks for a severance agreement on Thursday, September 19th. She takes the day off on Friday, September 20th, Saturday and Sunday are weekend and no one works. And Monday morning, she was given a draft severance agreement. And it was Monday afternoon that she was told not to go on a business trip on Tuesday. So the timing is such that she asks for a severance agreement on a Thursday, takes the day off Friday, gets the severance agreement on Saturday, and then is told not to go on the business trip. So I don't think that can be evidence that she was terminated. Thank you, Ms. Kapleman. Thank you, Your Honor, very much. Attorney Kapleman, you should mute your audio and video at this time. Attorney Goodman, you can unmute your device and you have three minutes of rebuttal, which you can begin by reintroducing yourself on the record. Robert Goodman for Emily Forsyth. The court needs to look at the record. All these accusations against me personally in the response brief, I refuted in the reply brief. She worked all day Monday. She didn't get a severance agreement Monday morning. The court can look at the email. She worked all day Monday. And Mr. McKnight and Mr. Witte, her supervisors, were told very different things, each from the other, about when she was terminated, how it occurred, whether it was a resignation, whether it was a termination. When did she get the letter? She got the letter late Monday. And Tuesday morning, she was told not to go on the business trip. I thought you just said she didn't get it Monday. She got it late Monday, Your Honor, late afternoon or evening. And I don't have the time with me, but it was not. She went to work on Monday. It wasn't as if she was going to work to receive a letter. And she said compelling. And it obviously wasn't compelling. And the judge baron's outcry question is very pertinent because it was one of the questions that Ms. Smith said he could have asked. I won't say that. It was one of the questions he could have asked, although she pointed out many other questions he should have asked and could have asked. And what the answer would have been, I told my girlfriend every time, especially in the last case, where he pulled his finger down her breastbone between her breasts. The verbal harassment was severe. It got so severe that one of her co-workers observed that Mr. McDole told her that he wanted to sabotage her career. It doesn't get any more serious than that. Before your time runs out, could you just address that separate decision-maker point on the retaliation claim? Yes, I will. Your Honor, this was clearly an HR and legal-driven termination. They were fully in possession of the fact that Mr. McKnight told Emily, told Ms. Forsythe, that he wanted to replace her with a man, and one of three men from Walmart, and he did. They were familiar with the verbal and sexual harassment of McDole. I've cited Staub, the Supreme Court decision. Were they familiar? They knew she had complained about that and had engaged in protracted activity when they... Of course. They were the recipients of the two complaints, first of sexual harassment and then of retaliation. The ultimate retaliation is what we're looking at here, the termination, not the interim retaliation by Mr. McKnight that was alleged by Ms. Forsythe of saying, he knew about my sexual harassment claim, and he told me, you know, don't be like the woman who didn't stay on my team. I want to replace you with one of three men, and boy, howdy, use a southern phrase, she got replaced by one of the three men in question. That's the time. Thank you, Your Honors. Thank you, Mr. Goodman. Bye-bye. That concludes argument in this case. Attorney Goodman and Attorney Kappelman, you should disconnect from the hearing at this time.